UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**NEVADA GENERAL INSURANCE COMPANY,**

    Plaintiff,

v.                                                                                    No. Civ. 11-183 JCH/CG

**PHILELICIA ENCEE,**

    Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Philelicia Encee's *Motion to Dismiss for Failure to State a Claim* [Doc. 8].  The Court, having considered the motion, briefs, exhibits, and relevant law, and being otherwise fully informed, finds that Defendant's motion is well taken and should be GRANTED.

## BACKGROUND

This case has its genesis in New Mexico's much-litigated uninsured motorists statute (NMSA § 66-5-301) and an associated regulation (NMAC 13.12.3.9).  In particular, Plaintiff Nevada General Insurance Company ("NGIC") challenges a recent interpretation of the statute and regulation by the New Mexico Supreme Court in *Jordan v. Allstate*, 2010-NMSC-051 (2010).  NGIC contends that, as interpreted by *Jordan*, NMSA § 66-5-301 and NMAC 13.12.3.9 violate NGIC's rights under the United States Constitution.

NGIC has brought a declaratory judgment action in this Court, seeking a determination of its rights and legal obligations with respect to Uninsured/Underinsured Motorist (UM/UIM) coverage.  NGIC has brought this action because of a related state court action currently pending as *Philelicia Encee v. Angelica Silva*, CV-2010-10045, in the Second Judicial District, County of Bernalillo, State of New Mexico.  The related state court action arises out of an automobile

accident that took place on July 24, 2010, between Ms. Encee and Angelica Silva. Ms. Encee and Ms. Silva dispute who caused the accident, and have filed claims against each other. Ms. Encee had an insurance policy with NGIC ("the Policy") that was in place at the time of the accident. *See* Ex. A, attached to Complaint [Doc. 1]. NGIC is representing Ms. Encee in the state court action under the liability coverage provisions of the Policy. In addition, Ms. Encee has represented to NGIC that Ms. Silva had no liability insurance at the time of the accident, and has demanded in the state court action that NGIC provide Ms. Encee with UM/UIM coverage.

Ms. Encee does not base her claim for UM/UIM coverage on an assertion that she selected and paid for such coverage. Indeed, as part of Ms. Encee's insurance application, she elected in writing to reject all UM/UIM coverage, and signed and dated her election to reject this coverage. *See* Ex. A-2, attached to Doc. 1. The Declarations Page provided for Ms. Encee's initial term of the Policy, as well as Declarations Pages for subsequent renewal periods, notified Ms. Encee in at least three separate places on a single page that she had chosen to reject UM/UIM coverage and indicated that she had the right to purchase such coverage by contacting her agent. *See* Exs. B and C-4, attached to Doc. 1. Instead, Ms. Encee claims that she is entitled to UM/UIM coverage because, under the New Mexico Supreme Court's decision in *Jordan v. Allstate*, her rejection of UM/UIM coverage was invalid and the Policy should therefore be reformed to provide UM/UIM coverage equal to the liability limits of the Policy.

The New Mexico Supreme Court filed its opinion in *Jordan* on October 18, 2010, approximately three months after the accident at issue in the related state court case. The *Jordan* court interpreted New Mexico's UM/UIM statute, NMSA § 66-5-301, to require auto insurers to provide policyholders with the premium costs corresponding to the available levels of UM/UIM coverage in order for a rejection of UM/UIM coverage to be considered valid. *Jordan*, 2010-

NMSC-051 at ¶¶ 2, 21, and 30. *Jordan* held that a failure to include a menu of available coverage options would result in a judicial reformation of the policy to include UM/UIM coverage equal to the liability limits of the policy. *Id*. at ¶¶ 2, 36.

In announcing its decision, the *Jordan* court held that its construction of the requirements for compliance with NMSA § 66-5-301 would be applied retroactively to reach policies, such as the one at issue in this case, that had been written prior to the decision. The court noted that this would "ensur[e] that every insured has been afforded his or her statutory right to either obtain UM/UIM insurance coverage equal to the liability limits of the policy or to make a knowing and intelligent rejection of part or all of that coverage." *Id*. at ¶ 28.

The *Jordan* court offered several rationales for applying its decision retroactively. It noted that "[d]espite this Court's repeated pronouncements that an insured's decision to reject UM/UIM coverage must be knowing and intelligent in order to effectuate New Mexico's public policy...these consolidated cases indicate that insurers continue to offer UM/UIM coverage in ways that are not conducive to allowing the insured to make a realistically informed choice." *Id.* at ¶ 20. It explained that "although in the past we have not expressly articulated the need for insurers to provide premium costs for each available UM/UIM coverage level, our holding is based on settled principles articulated in twenty years of UM/UIM jurisprudence." *Id*. at ¶ 27. The court found that "retroactive application will provide meaningful enforcement of the requirements of [NMSA] 66-5-301 and 13.12.3.9 NMAC..." and that "[a]s we noted in *Marckstadt [v. Lockheed Martin Corp.*, 147 N.M. 678, 689 (2009)], 'the Legislature and the superintendent of insurance intended their rules to take effect immediately, and we will not second-guess them.'" *Id*. at ¶ 28. The court concluded that "on balance, we deem it more equitable to let the financial detriments be borne by insurers, who were in a better position to

ensure meaningful compliance with the law, than to let the burdens fall on non-expert insureds, who are the Legislature's intended beneficiaries." *Id*. at ¶ 29.

Plaintiff does not ask this Court to determine whether Ms. Encee's rejection of UM/UIM coverage was effective under New Mexico law. That is an issue to be determined in the related state court case. Instead, Plaintiff asks this Court to find that *Jordan*'s interpretation of New Mexico's UM/UIM statute (NMSA § 66-5-301) violates the Contracts Clause and the Takings Clause of the United States Constitution by forcing it to provide coverage for which it did not receive payment.

## **LEGAL STANDARD**

Defendant has moved to dismiss this case pursuant to Fed. R. Civ. P. Rule 12(b)(6). Rule 12(b)(6) provides in relevant part that "failure to state a claim upon which relief can be granted" is a defense to a claim for relief in any pleading. A motion to dismiss should be granted if, viewing the well-pleaded factual allegations of the complaint as true, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). In considering a Rule 12(b)(6) motion, a court must assume all well-pleaded facts, but not conclusory allegations, to be true, and must draw all reasonable inferences in favor of a plaintiff. *See Housing Auth. of the Kaw Tribe v. City of Ponca,* 952 F.2d 1183, 1187 (10th Cir. 1991); *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir. 1998).

In addressing pleading requirements, the Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). In determining whether a complaint states a plausible claim for relief, the Court must engage in "a context-specific task that requires [it] to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). In evaluating a Rule 12(b)(6) motion, the Court's function "is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf and Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999).

## ANALYSIS

Plaintiff contends that the *Jordan* court's interpretation of New Mexico's UM/UIM statute violates its rights under the United States Constitution by substantially rewriting the law to add requirements that the statute does not contain. NMSA § 66-5-301 entitles an insured to purchase UM/UIM coverage "in minimum limits...and such higher limits as may be desired...up to the limits of liability" and also gives an insured the right to reject UM/UIM coverage. New Mexico Administrative Code regulation 13.12.3.9 provides that "[t]he rejection of the provisions covering damage caused by an uninsured or unknown motor vehicle as required in writing by the provisions of Section 66-5-301 NMSA 1978 must be endorsed, attached, stamped or otherwise made a part of the policy of bodily injury and property damage insurance."

The meaning of this statute and regulation has been subject to judicial interpretation numerous times over the years. In 1990, the New Mexico Supreme Court laid out the basic requirements for a valid rejection of UM/UIM coverage as consisting of: (1) a written rejection;

(2) that is endorsed, attached, stamped, or otherwise made a part of the policy; and (3) that clearly and unambiguously calls to the attention of the insured the fact that the UM/UIM coverage has been waived. *Romero v. Dairyland Ins. Co.*, 111 N.M. 154, 156 (1990). Case law developed to require that a waiver be made "knowingly and intelligently." *Marckstadt v. Lockheed Martin Corp.*, 147 N.M. 678, 684(2009); *Vigil v. Rio Grande Ins. Co. of Santa Fe*, 124 N.M. 324, 326 (Ct. App. 1997).

In effectuating the requirement that a waiver be made knowingly and intelligently, the Court of Appeals in *Romero v. Progressive Northwestern Ins. Co.*, 148 N.M. 97, 103 (Ct. App. 2009) held that an insurer must include notice that UM/UIM coverage could be increased to equal liability limits and the insured must be notified that he or she has rejected an amount of UM/UIM coverage that he or she has a statutory right to purchase. Several months later, in *Farmers Ins. Co. v. Chen*, 148 N.M. 151, 154 (Ct. App. 2010), the New Mexico Court of Appeals recognized that case law had not yet prescribed the specific information that an insurer was required to provide to its insureds in order to enable them to make a knowing and intelligent rejection of UM/UIM coverage. It therefore held that, "at a minimum, insureds must be clearly informed as to: the amount of coverage they are entitled to purchase; the amount of coverage they have in fact purchased; and the fact that they have rejected some amount of coverage." *Id*. Interestingly, the *Chen* court issued its decision laying out these requirements months before Ms. Encee purchased the Policy purporting to reject UM/UIM coverage.

The *Jordan* case took these prior interpretations a step further by holding that a rejection could not be knowingly and intelligently made unless the written rejection form provided the premium charge corresponding to each level of coverage offered and stating that, unless all of the notification requirements were strictly met, UM/UIM coverage would be read into the policy

in an amount equal to liability limits. 2010-NMSC-051 at ¶ 21. Plaintiff claims that *Jordan* and other case law essentially rewrote New Mexico's UM/UIM law by adding requirements that the initial statute did not contain, and that the statute, as interpreted by *Jordan*, unconstitutionally impairs NGIC's contractual rights and unconstitutionally takes NGIC's property for public use without compensation.

  A. <u>Contract Clause Claim</u>

Under the "Contract Clause" of the United States Constitution, states are prohibited from enacting any "Law impairing the Obligation of Contracts." U.S. Const. Art. 1, § 10, cl. 1. Plaintiff contends that NMSA § 66-5-301, as construed by *Jordan*, operates as a substantial impairment of the contractual relationship between NGIC and its insureds who never purchased or paid for UM/UIM coverage because it confers on those insureds a benefit for which they did not contract and forces NGIC to undertake a risk for which it was not compensated. In addition, Plaintiff contends that the statute as interpreted interferes with the contracts between NGIC and its policyholders who did pay for UM/UIM coverage, because those policyholders do not receive any extra benefit in exchange for their UM/UIM premium payments and those payments effectively subsidize UM/UIM coverage for those who did not purchase or pay for such coverage.

While the frustration that NGIC has expressed regarding its incursion of unexpected obligations based on the retroactive application of newly-imposed requirements is understandable, NGIC cannot challenge such obligations under the Contract Clause. Almost a century ago, the Supreme Court recognized that "[i]t has been settled by a long line of decisions, that the provisions of [the Contract Clause], protecting the obligation of contracts against state action, is directed only against impairment by legislation and not by judgments of courts." *Tidal*

*Oil Co. v. Flanagan*, 263 U.S. 444, 451 (1924).  The *Tidal Oil* Court noted that the language of the Contract Clause, which speaks only to laws passed by states, compels such a conclusion.  *Id*.

*Tidal Oil* involved the validity of a lease.  At the time the lease was entered into, the Oklahoma Supreme Court had construed the statute governing the lease in a particular manner.  Several years after the lease was entered into, the state Supreme Court, for the first time and in conflict with previous decisions, added new conditions that rendered the lease void. *Id*. at 448-49.  The appellant argued that, by reversing its previous decision and changing a rule of property in reliance upon which the lease had been made, the decision unconstitutionally impaired the obligation of the contract in violation of the Contract Clause.  *Id*. at 449.  The appellant relied upon a series of cases in which federal courts addressed the validity of contracts entered into based in reliance upon a state Supreme Court decision only to have the contract declared invalid because of a later state Supreme Court decision.  The *Tidal Oil* Court pointed out that, in upholding the validity of these contracts, federal courts did not base their conclusions on the Contract Clause, but rather on the state law as the federal court determined it.  *Id*. at 452.  The Court reiterated that "[t]he mere reversal by a state court of its previous decision, as in this case before us, whatever its effect upon contracts, does not, as we have seen, violate any clause of the Federal Constitution."  *Id*. at 455.

Plaintiff attempts to escape *Tidal Oil*'s fatal consequences for its Contract Clause claim by characterizing its claim as not attacking the New Mexico Supreme Court's judgment in *Jordan*, but rather the UM/UIM law as "rewritten" by *Jordan*.  Pl. Resp. to Mot. to Dismiss [Doc. 12] at 8.  To support this distinction, Plaintiff cites *Tidal Oil* for the proposition that "it is the statute as enforced by the State through its courts which impairs the contract, not the judgment of the court."  *Id*. at 8-9 (citing *Tidal Oil*, 263 U.S. at 453).  However, this quotation

does not help Plaintiff in this context of this case, as it refers only to cases in which a statute was passed subsequent to entrance into the contract in question.  In such cases, the Supreme Court "accepts the meaning put upon the impairing statute by the state court as authoritative," and determines whether that subsequently passed statute impairs the contract that existed prior to the passage of the statute.  263 U.S. at 453.  The present case clearly does not involve a statute passed after NGIC entered into a contract with Ms. Encee, and the quoted portion of *Tidal Oil* is therefore inapposite.

  Plaintiff also cites a discussion in *Tidal Oil* referring to cases in which "a law of the State constitutes part of the contract and, to make the constitutional inhibition effective, this Court must exercise an independent judgment in deciding as to the validity and construction of the law and the existence and terms of the contract."  Pl. Resp. to Mot. to Dismiss [Doc. 12] at 9 (citing *Tidal Oil*, 263 U.S. at 453).  This concept, too, is inapplicable to the context of the present case.  The quoted discussion refers only to instances in which a state law or act is literally part of the terms of a contract between the state and a private party.  *See, e.g., McGahey v. Virginia*, 135 U.S. 662 (1890) (whether Act creating bonds issued by a state and incorporating the terms of the Act into those bonds constituted a valid contract that could not be broken by the legislature was a question for a federal court).  This has no applicability to this case, as no terms of a state law are directly incorporated into the Policy between NGIC and Ms. Encee.

  In further arguing that it is challenging the UM/UIM statute as interpreted by *Jordan*, rather than the *Jordan* decision itself, and that this Court therefore has the authority to review the constitutionality of a decision of the New Mexico Supreme Court involving the construction of a state statute, Plaintiff cites language from two additional Supreme Court cases.  *See* Pl. Resp. to Mot. to Dismiss [Doc 8] at 8.  In *Minnesota ex rel. Pearson v. Probate Court*, 309 U.S. 270, 273

(1940), the Court held that, for the purpose of determining whether a state statute is constitutionally valid, "we must take the statute as though it read precisely as the highest court of the State has interpreted it." Similarly, in *Winters v. New York*, 333 U.S. 507, 514 (1948), the Court held that when a state statute has been construed so that "interpretation by [the state court] puts these words in the statute as definitely as if it had been so amended by the legislature, claims that it violated the constitution must be judged in that light." However, these cases are unavailing because they do not involve a Contract Clause challenge to a judicial decision and therefore do not provide support for Plaintiff's position. *Pearson* involved a vagueness challenge to a state statute defining a "psychopathic personality." The Court held that, as construed by the state court, the statute was not unconstitutionally vague. *Pearson*, 309 U.S. at 274. Similarly, the Court in *Winters* held that, as interpreted by the state court, a criminal statute governing distribution of certain magazines was unconstitutionally vague. *Winters*, 333 U.S. at 520. These cases are not relevant to the question of whether a judicial determination can give rise to a Contract Clause challenge of a statute. In fact, Plaintiff has not pointed to a single case in which a judicial decision interpreting a statute has given rise to a valid Contract Clause claim.

In support of its argument that Plaintiff cannot bring a Contract Clause challenge based on a court decision, Defendant cites *Bradbury v. Aetna*, 589 P.2d 785 (Wa. 1979). While clearly not binding on this court, the cited case is illustrative of the issue in this case. *Bradbury* concerned the retroactive application of a judicial decision ordering stacking of an uninsured motorist policy even though releases in full satisfaction of the insurance company's obligations had been signed by the plaintiff prior to the court's decision on stacking. The court rejected the argument that retroactive application of a case interpreting a statute for the first time to provide for stacking of coverage violated the Contract Clause. 589 P.2d at 788. The court found that the

Contract Clause reaches legislative actions only, and cannot be used to challenge a judicial decision. *Id*. This is the same conclusion the Court reaches in this case.

While Plaintiff tries to present its claim as relating to the UM/UIM statute rather than challenging the *Jordan* decision, as a practical matter it is not challenging the statute that has been in place for nearly 30 years, but rather the recent interpretation of the statute. Such an attempt is clearly foreclosed. As the Supreme Court recognized in denying a Contract Clause challenge in *Fleming v. Fleming*, 264 U.S. 29, 31 (1924):

> It is urged upon us that the impairment here is legislative...that the subsequent judicial construction of [the statute] became part of the statute and gave it a new effect as a law. In other words, the contention is that the same statute was one law when first construed, before the making of the contract, and has become a new and different act of the legislature by the later decision of the court. This is ingenious but unsound. It is the same law. The effect of the subsequent decisions is not to make a new law, but only to hold that the law always meant what the court now says it means. The court has power to construe a legislative act, but it has no power by change in construction to date its passage as a law from the time of the later decision. A statute in force when a contract was made can not be made a subsequent statute through new interpretation by the courts.

264 U.S. at 31. Because the *Jordan* decision is not a "law" as that term is used in the Contract Clause, even taking as true all of the facts alleged in the Complaint, Plaintiff's Contract Clause count must be dismissed for failure to state a claim.

      B.    <u>Takings Clause Claim</u>

Plaintiff also alleges that *Jordan*'s construction of New Mexico's UM/UIM statute violates the Takings Clause of the United States Constitution. The Takings Clause derives from the Fifth Amendment, which mandates that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. This clause applies to the states through the Fourteenth Amendment. *See Lingle v. Chevron, U.S.A., Inc.*, 544 U.S. 528, 536 (2005). Plaintiff contends that, through its opinion construing the UM/UIM statute, the *Jordan* court essentially

11

enacted "an economic regulation creating a liability to pay money to third parties, which does not pass a 'justice and fairness' analysis," and that the retroactive manner in which the opinion operates "effectively us[es] money...paid in premiums to subsidize gratuitous UM/UIM coverage for policyholders that did not purchase or pay for UM/UIM coverage." Complaint [Doc. 1] at 11-12 ¶¶ 28-29.

As a general principle, the Takings Clause is meant "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Although "[t]he paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of property," *Lingle*, 544 U.S. at 537, the Constitution also guards against certain regulatory interferences with a property owner's interest in its property. Two categories of regulatory action constitute *per se* takings: (1) where the government requires a property owner to undergo a permanent physical invasion of that property; and (2) where a regulation "completely deprive[s] an owner of '*all* economically beneficial use' of her property." *Id*. at 538 (citation omitted) (emphasis in original). In addition to these categories, the Supreme Court also recognizes the more amorphous standard that "while property may be regulated to a certain extent, if that regulation goes too far, it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). These broader regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). *See Lingle*, 544 U.S. at 538-39. The *Penn Central* Court eschewed any bright-line rule for resolving regulatory takings claims that do not constitute a physical taking or a complete deprivation of all economic use, but it identified factors that have a particular significance in the analysis. *Penn Central*, 438 U.S. at 124. It looked at "the economic impact of the regulation on

12

the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Id*. It also considered the "character of the governmental action," such as whether the action amounts to a physical invasion or merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good." *Id*.

Plaintiff does not contend that the *Jordan* court's decision falls into one of the categories of a *per se* regulatory taking. Instead, though it does not explicitly cite *Penn Central*, Plaintiff appears to be arguing that the decision essentially constitutes a regulation that results in a taking when analyzed under the *Penn Central* factors. In granting Defendant's motion to dismiss, the Court is focused only on whether a judicial interpretation of a regulatory statute that compels an insurance company to cover benefits for a particular subgroup can constitute a taking; it is not basing its decision on any evaluation of the *Penn Central* factors, which would be an improper consideration of the merits at the motion to dismiss stage.

As an initial matter, it is not clear that a judicial decision can form the basis for a Takings Clause claim. The Supreme Court addressed this question in *Stop the Beach Renourishment, Inc. v. Fl. Dep't of Envtl. Prot.*, 560 U.S. ___, 130 S.Ct. 2592 (2010), but failed to reach a definitive answer. *Stop the Beach Renourishment* concerned a challenge by beachfront property owners to a government beach restoration project. The Florida Supreme Court determined that the legislation under which the project was undertaken did not constitute a taking of private property by the government. The property owners claimed that the Florida Supreme Court's decision finding that the project did not constitute a taking was itself a taking of the property owners' property rights. 130 S.Ct. at 2600. Although the Supreme Court unanimously held that the Florida Supreme Court's decision did not constitute a taking, it did not reach a majority

decision on the question of whether a judicial decision determining a property owner's rights can constitute a taking.  Four of the Justices, in two separate concurring opinions, concluded that the case did not require the Court to determine whether, or under what circumstances, such a judicial decision can violate the Takings Clause.  *Id*. at 2613, 2618.  Four of the other Justices[1] concluded that a judicial decision could constitute a taking, under the proper circumstances.  According to this plurality opinion, the test for whether a judicial decision could constitute a taking is not whether there was precedent for the allegedly confiscatory decision, or whether the decision was predictable, but rather only whether the court has declared that what was once an established private property right no longer exists.  *Id*. at 2610.  The plurality rejected predictability as a test because "[a] decision that clarifies property entitlements (or the lack thereof) that were previously unclear might be difficult to predict, but it does not eliminate established property rights."  *Id*.  Under the plurality's test, "[a] property right is not established if there is doubt about its existence; and when there is doubt we do not make our own assessment but accept the determination of the state court."  *Id*. at 2608 n.9.

     Not only did *Stop the Beach Renourishment* not generate a majority opinion establishing that a judicial decision could constitute a violation of the Takings Clause, but Plaintiff has also not pled the elements of a judicial taking, even if the plurality's view were established law. Plaintiff's Complaint described NGIC's inability to anticipate the *Jordan* decision and its belief that its liabilities under the UM/UIM coverage provisions of the issued policies had been previously limited.  *See* Complaint [Doc. 1] at 12 ¶¶ 30-31.  The Complaint does not claim that, in providing the technical requirements for a valid rejection of UM/UIM coverage, the *Jordan*

---

[1] Justice Stevens took no part in the decision; thus only eight Justices participated.

decision stripped away a previously established private property that had not been in doubt.

Even if the Court were to assume that a judicial decision could constitute a taking and that Plaintiff had sufficiently pled the elements of the plurality's test in *Stop the Beach Renourishment*, Plaintiff has not demonstrated that the type of liability imposed by the UM/UIM statute as interpreted by *Jordan* can constitute a taking. Plaintiff contends that "the United States Supreme Court has held that laws violate the Takings Clause where they impose a liability to pay money, not to the Government, but to private third parties," citing *Eastern Enters. v. Apfel*, 524 U.S. 498, 528-29 (1998). Pl. Resp. to Mot. to Dismiss [Doc. 12] at 12. *Apfel* concerned a piece of Congressional legislation (the Coal Act) that retroactively created an obligation for a former coal mining company (Eastern) to pay medical benefits for certain former employees, even though the company had transferred its coal mining business many years prior to the passage of the Coal Act. The Coal Act, passed in 1992, reached back almost 50 years to impose a new liability on Eastern based on the company's business conducted between 1946 and 1965. *Apfel*, 524 U.S. at 532. Although the *Apfel* Court found that the legislation imposing the monetary assessment on the former coal company was unconstitutional, *Apfel* fails to support Plaintiff's claim to have a cause of action under the Takings Clause for two reasons.

First, the five Justices who concluded that the Coal Act was unconstitutional could not agree on the basis for their conclusion, and a majority of the Justices to consider the case found that the issue should not have been subject to a Takings Clause analysis. Using the three *Penn Central* factors, Justice O'Connor wrote a plurality opinion, joined by three other Justices, that held that the monetary assessment imposed by the legislation constituted a taking of property. *Id*. at 529. Although Justice Kennedy concurred in the judgment of the Court because he believed that the imposition of liability by the Coal Act was the type of retroactive legislation

15

that violated the Due Process Clause, he dissented from the plurality's Takings Clause analysis. *Id*. at 540.  Justice Kennedy wrote that the Coal Act "simply imposes an obligation to perform an act, the payment of benefits...[and] [t]o call this sort of governmental action a taking as a matter of constitutional interpretation is both imprecise and, with all due respect, unwise." *Id*.  Justice Kennedy went on to write that the Coal Act could not affect a taking because it "neither targets a specific property interest nor depends upon any particular property for the operation of its statutory mechanisms.  The liability imposed on Eastern no doubt will reduce its net worth and total value, but this can be said of any law which has an adverse economic effect." *Id*. at 543.  Justice Breyer, writing for the four Justices dissenting from the judgment of the Court, disagreed not only with the conclusion that the Coal Act was unconstitutional, but also with the plurality's use of the Takings Clause to analyze the legislation.  He wrote that "[a]s a preliminary matter, I agree with Justice Kennedy...that the plurality views this case through the wrong lens.  The Constitution's Takings Clause does not apply." *Id*. at 554.  Because the "case involves, not an interest in physical or intellectual property, but an ordinary liability to pay money, and not to the Government, but to third parties," Justice Breyer concluded that the Takings Clause was inapplicable and the legislation should be analyzed under the Due Process Clause.  *Id*. at 554-55.  Thus, contrary to Plaintiff's suggestion, the majority of Justices to consider the question in *Apfel* concluded that legislation imposing an obligation to pay money to a third party should *not* be subject to a Takings Clause challenge.

In addition, the *Apfel* Court was concerned with the constitutionality of a piece of retroactive legislation, not with a judicial decision, such is at issue in this case.  This distinction is crucial.  The Court spent several pages discussing the extent to which retroactive legislation is deeply disfavored, and embraced the suggestion that, just as the *Ex Post Facto* Clause is directed

16

at the retroactivity of penal legislation, the Takings Clause provides a safeguard against retroactive legislation affecting property rights. *Id*. at 532-34. No such disfavor applies to the retroactive application of judicial decisions interpreting legislation. Indeed, as the *Jordan* court recognized, federal courts employ a "bright-line rule applying appellate court decisions retroactively in all civil cases" and New Mexico courts follow "'a presumption that a new rule adopted by a judicial decision in a civil case will operate retroactively." *Jordan*, 2010-NMSC-51 at ¶ 26 (citing *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 90 (1993) and quoting *Beavers v. Johnson Controls World Servs., Inc.*, 118 N.M. 391, 398 (1994)). Thus, even the *Apfel* plurality's holding is not applicable to this case, and Plaintiff has failed to provide support for its claim that the *Jordan* court's decision could have effected a taking.

## CONCLUSION

Under Plaintiff's theory, any court interpretation of a regulatory statute that imposes a stricter burden on a regulated enterprise could constitute an impairment of contract or a taking. Such judicial interpretations occur every day, yet Plaintiff has not pointed to a single case finding such claims to be viable. This court declines to be the first to make such a finding. Thus, Plaintiff's Contract Clause and Takings Clause claims fail, and its case must be dismissed for failure to state a claim.

**IT IS THEREFORE ORDERED** that Defendant's *Motion to Dismiss for Failure to State a Claim* [Doc. 8] is GRANTED.

UNITED STATES DISTRICT JUDGE